# IN THE SUPREME COURT OF IOWA

No. 19–1917

Submitted February 22, 2022—Filed June 10, 2022

**JAMES ELVIN DORSEY,**

Petitioner,

vs.

**STATE OF IOWA,**

Respondent.

Appeal from the Iowa District Court for Polk County, Robert B. Hanson, Judge.

The appellant challenges the constitutionality of his sentence of life imprisonment without the possibility of parole for first-degree murder. **PETITION FOR WRIT OF CERTIORARI GRANTED AND WRIT ANNULLED.**

McDonald, J., delivered the opinion of the court, in which Christensen, C.J., and Waterman, Mansfield, Oxley, and McDermott, JJ., joined. Appel, J., filed a dissenting opinion.

Alexander Smith (argued) of Parrish Kruidenier Gentry Brown Bergmann & Messamer L.L.P., Des Moines, for petitioner.

Thomas J. Miller, Attorney General, and Louis S. Sloven (argued), Assistant Attorney General, for respondent.

**McDONALD, Justice.**

Petitioner James Dorsey shot and killed a woman when he was eighteen years and five days old. He was found guilty of murder in the first degree and was sentenced to a mandatory term of life in prison without the possibility of parole. Dorsey contends this sentence violates his state constitutional right to be free from "cruel and unusual punishment." Iowa Const. art. I, § 17. He argues the state constitution prohibits imposing a mandatory punishment on a young adult offender and instead requires the district court to hold an individualized sentencing hearing before imposing any sentence. He further argues his life sentence without the possibility of parole is grossly disproportionate to the crime. For the reasons expressed below, we affirm Dorsey's sentence.

I.

On September 3, 1984, Dorsey, accompanied by two other men, entered the Des Moines home of Juanita Weaver with a shotgun. Dorsey went to Weaver's home to retrieve a revolver that Dorsey and Weaver's son had previously stolen from Dorsey's uncle. After Dorsey entered the home, he realized Weaver's son was not there. Weaver went into the living room upon hearing noises in the home and came upon Dorsey and the two other men. Dorsey fired at Weaver and missed. Weaver ran into the bathroom, and Dorsey followed, where he shot Weaver at close range and killed her. The three men fled the scene and went to a party but were eventually arrested. A jury found Dorsey guilty of murder in the first degree, and the district court sentenced Dorsey to a mandatory term of life in prison without the possibility of parole.

In the nearly thirty-eight years since the murder, Dorsey has challenged his conviction and resulting mandatory life sentence on numerous occasions. His conviction was first affirmed on direct appeal in February 1986. In September 1986, Dorsey filed two separate but overlapping applications for postconviction relief. The applications were treated as a single application and dismissed as meritless in March 1994. Dorsey filed a second application for postconviction relief in November 1994, which the district court dismissed as time-barred. Dorsey filed his third and fourth applications for postconviction relief in January 1999 and October 2008, which were also dismissed as time-barred.

In January 2014, Dorsey filed a motion to correct an illegal sentence in the underlying criminal case. In that motion, he contended that his mandatory life sentence without the possibility of parole inflicted cruel and unusual punishment upon him in violation of the Federal and State Constitutions. In support of his argument, Dorsey relied on United States Supreme Court precedents stating that juvenile offenders have diminished culpability and better chances for reform and that "the penological justifications for imposing the harshest sentences on juvenile offenders" are diminished and, in some instances, categorically prohibited. *Miller v. Alabama*, 567 U.S. 460, 472 (2012); *see id.* at 489 ("By requiring that all children convicted of homicide receive lifetime incarceration without possibility of parole, regardless of their age and age-related characteristics and the nature of their crimes, the mandatory-sentencing schemes before us violate this principle of

proportionality, and so the Eighth Amendment's ban on cruel and unusual punishment."); *Graham v. Florida,* 560 U.S. 48, 82 (2010) ("The Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide. A State need not guarantee the offender eventual release, but if it imposes a sentence of life it must provide him or her with some realistic opportunity to obtain release before the end of that term."); *Roper v. Simmons,* 543 U.S. 551, 578 (2005) ("The Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed."). Dorsey recognized that he was not a juvenile at the time of the offense, but he argued "[t]he courts in Iowa are expanding on the ruling of the United States Supreme Court" by applying the same rationale in other contexts. The district court denied the motion. Although Dorsey raised both a federal and state constitutional claim in his motion, the district court's order referenced only the federal claim.

The filing at issue in this case is Dorsey's fifth application for postconviction relief. In his application, Dorsey argued that his mandatory life sentence without the possibility of parole violated the federal and state constitutional prohibitions against cruel and unusual punishment. In support of his claims, Dorsey relied on this court's more recent juvenile sentencing jurisprudence applying and extending *Roper v. Miller, Graham v. Florida,* and *Miller v. Alabama. See generally State v. Roby,* 897 N.W.2d 127 (Iowa 2017); *State v. Sweet,* 879 N.W.2d 811 (Iowa 2016); *State v. Louisell,* 865 N.W.2d 590 (Iowa 2015); *State v. Seats,* 865 N.W.2d 545 (Iowa 2015); *State v. Lyle,* 854

N.W.2d 378 (Iowa 2014); *State v. Ragland*, 836 N.W.2d 107 (Iowa 2013); *State v. Pearson*, 836 N.W.2d 88 (Iowa 2013); *State v. Null*, 836 N.W.2d 41 (Iowa 2013). Dorsey relied specifically on *State v. Lyle*, in which this court held that "all mandatory minimum sentences of imprisonment for youthful offenders are unconstitutional under the cruel and unusual punishment clause in article I, section 17 of our constitution." 854 N.W.2d at 400. He also relied on *State v. Sweet*, which created "a categorical rule that juvenile offenders may not be sentenced to life without the possibility of parole under article I, section 17 of the Iowa Constitution." 879 N.W.2d at 839. In his application, Dorsey recognized that these holdings explicitly applied only to juvenile offenders, but he argued the cases should be extended or their holdings modified to provide relief for young adult offenders. He argued *Lyle* and *Sweet* should preclude the imposition of mandatory punishments on young adult offenders and should require individualized sentencing hearings for all young adult offenders, including those convicted of murder in the first degree.

The district court declined to provide Dorsey any relief and granted the State's motion for summary disposition of the claims. The district court held Dorsey's application for postconviction relief was barred by the three-year statute of limitations set forth in Iowa Code section 822.3 (2019). The district court also concluded that, to the extent Dorsey's claims could be considered a motion to correct an illegal sentence, the claims were barred res judicata because Dorsey raised the same claims in his 2014 motion to correct an illegal sentence. Finally, the district court concluded that Dorsey was not entitled to any relief on the

merits because *Lyle* and *Sweet* applied only to juvenile offenders and not adult offenders. Dorsey timely filed his notice of appeal, and we retained the case.

## II.

When an offender files an application for postconviction relief and "complains his sentence is illegal . . . the claim 'is not a postconviction relief action.' " *Bonilla v. State*, 791 N.W.2d 697, 699 (Iowa 2010) (quoting *Veal v. State*, 779 N.W.2d 63, 65 (Iowa 2010)). Instead, the application for postconviction relief is treated as a motion to correct an illegal sentence. *Id.* at 699–700. We therefore construe Dorsey's application for postconviction relief as a motion to correct an illegal sentence. There is no appeal as a matter of right from the denial of a motion to correct an illegal sentence. *See State v. Propps*, 897 N.W.2d 91, 96–97 (Iowa 2017). However, when a case is initiated by a notice of appeal, but another form of review is proper, we need not dismiss the action and may proceed instead as though the proper form of review was requested. Iowa R. App. P. 6.108. We treat Dorsey's "notice of appeal and accompanying briefs as a petition for writ of certiorari, as we conclude that appeals from a motion to correct an illegal sentence are most appropriately fashioned in this manner. We grant the petition for writ of certiorari." *Propps*, 897 N.W.2d at 97.

## III.

The district court denied Dorsey's challenge to his mandatory life sentence without the possibility of parole on three grounds. First, the district court held that Dorsey's application for postconviction relief was barred by the three-year statute of limitations set forth in Iowa Code section 822.3. Second, the district

court held Dorsey's claims were barred res judicata because Dorsey had raised the same claims in his 2014 motion to correct an illegal sentence. Finally, the district court concluded that Dorsey was not entitled to any relief on the merits. We address each ruling in turn.

A.

The statute of limitations governing postconviction-relief proceedings does not bar Dorsey's constitutional challenge to his sentence. In general, an application for postconviction relief "must be filed within three years from the date the conviction or decision is final or, in the event of an appeal, from the date the writ of procedendo is issued." Iowa Code § 822.3. But the statute of limitations for postconviction-relief proceedings is not applicable here. As discussed above, the district court should have treated Dorsey's application for postconviction relief as a motion to correct an illegal sentence. *See Bonilla*, 791 N.W.2d at 699–700. Because an offender can file a motion to correct an illegal sentence at any time, the motion "is not governed by the postconviction statute of limitations." *Veal*, 779 N.W.2d at 65. The district court thus erred to the extent it held that Dorsey's claims were barred by section 822.3. *See id.* (stating that when a claim of an illegal sentence is raised in an application for postconviction relief, even when "not labeled as such, the district court . . . should treat [the] application for postconviction relief as a challenge to an illegal sentence that is not subject to the three-year statute of limitations in Iowa Code section 822.3").

B.

Nor can we conclude Dorsey's challenge to his sentence is barred res judicata. Under Iowa law, "res judicata embraces two concepts: claim preclusion and issue preclusion." *Braunschweig v. Fahrenkrog,* 773 N.W.2d 888, 893 (Iowa 2009). "The general rule of claim preclusion holds that a valid and final judgment on a claim bars a second action on the adjudicated claim or any part thereof." *Pavone v. Kirke,* 807 N.W.2d 828, 835 (Iowa 2011). "[I]ssue preclusion prevents parties to a prior action in which judgment has been entered from relitigating in a subsequent action issues raised and resolved in the previous action." *Hunter v. City of Des Moines,* 300 N.W.2d 121, 123 (Iowa 1981) (footnote omitted). "The term 'issue preclusion' is used interchangeably with the term 'collateral estoppel.' " *Id.* at 123 n.2.

We cannot conclude the doctrines of claim preclusion and issue preclusion bar consideration of Dorsey's claim. First, Dorsey's 2014 motion to correct an illegal sentence raised federal and state constitutional claims, but the district court's order addressed only Dorsey's federal claim. There was no ruling on Dorsey's state constitutional claim in the prior motion. Second, following the denial of Dorsey's 2014 motion, this court created new categorical rules regarding juvenile sentencing. In *Lyle,* this court held that "all mandatory minimum sentences of imprisonment for youthful offenders are unconstitutional under the cruel and unusual punishment clause in article I, section 17 of our constitution." 854 N.W.2d at 400. Two years later, in *Sweet,* this court extended *Lyle* and created "a categorical rule that juvenile offenders may not be sentenced

to life without the possibility of parole under article I, section 17 of the Iowa Constitution." 879 N.W.2d at 839. Dorsey seeks to take advantage of these new categorical rules in our state constitutional jurisprudence and extend the rationale of *Lyle* and *Sweet* to young adult offenders such as himself. In other cases, we have allowed article I, section 17 challenges to the constitutionality of sentences following changes in our jurisprudence, and we see no reason to uniquely preclude Dorsey's challenge. The district court erred in holding Dorsey's claim based on new law was barred.

C.

We next address the district court's alternative ruling on the merits of Dorsey's challenge to his sentence. In the district court, Dorsey raised federal and state constitutional challenges to his sentence. On appeal, Dorsey raises only his state constitutional claim arising under article I, section 17 of the Iowa Constitution, which prohibits the infliction of "cruel and unusual punishment." Dorsey contends the Iowa Constitution categorically prohibits the imposition of a mandatory sentence on a young adult offender and instead requires an individualized sentencing hearing. We conclude the district court did not err in denying Dorsey's state constitutional claim on the merits.

Generally, "[t]he legislature possesses the inherent power to prescribe punishment for crime, and the sentencing authority of the courts is subject to that power." *State v. Iowa Dist. Ct. for Shelby Cnty.*, 308 N.W.2d 27, 30 (Iowa 1981). It is solely the legislature's prerogative to set punishments that balance the state's interest in achieving certain penological interests with the other

interests related to the administration of criminal justice. The legislature's prerogative to set punishments is circumscribed only by the Federal and State Constitutions. In *Sweet* and *Lyle*, this court held article I, section 17 circumscribes the legislature's prerogative in imposing certain punishments on juvenile offenders. *See Sweet*, 879 N.W.2d at 839; *Lyle*, 854 N.W.2d at 400.

The *Sweet* and *Lyle* courts offered several justifications for the creation of this categorical limitation. *See, e.g., Sweet*, 879 N.W.2d at 830–34 (identifying fourteen critical points drawn from the federal caselaw and the three critical principles distilled from the Iowa caselaw). Among these justifications were medical literature tending to show the human brain continues to develop until the age of twenty-five and medical and social science literature tending to show juveniles think and act differently than adults. *See, e.g., Null*, 836 N.W.2d at 55 (stating the rationale is based on (1) recent scientific evidence showing "the human brain continues to mature into the early twenties," and (2) a finding that young people generally "lack the ability to properly assess risks and engage in adult-style self-control").

While Dorsey acknowledges that our precedents in this area create categorical rules applicable only to juvenile offenders and that he was not a juvenile at the time of the offense, he argues the same medical and social science literature applies with equal force to adult offenders under age twenty-five. At minimum, he argues someone like him, who was only eighteen years and five days old at the time of his offense, is entitled to a *Miller* sentencing hearing before the imposition of a life sentence.

But the arguments by Dorsey and the dissent are foreclosed by the same precedents on which they rely. As we stated in *Lyle*:

> [O]ur holding today has no application to sentencing laws affecting adult offenders. Lines are drawn in our law by necessity and are incorporated into the jurisprudence we have developed to usher the Iowa Constitution through time. This case does not move any of the lines that currently exist in the sentencing of adult offenders.

854 N.W.2d at 403. We later reiterated that "the line between being a juvenile and an adult was drawn for cruel and unusual punishment purposes at eighteen years of age." *Seats*, 865 N.W.2d at 556–57. And in *Sweet* we stated that "[t]he qualities that distinguish juveniles from adults do not disappear when an individual turns eighteen, but society has generally drawn the line at eighteen for the purposes of distinguishing juveniles from adults." 879 N.W.2d at 831.

The categorical constitutional distinction this court drew between juveniles and adults was based on the long-accepted legal categorical distinction drawn between juveniles and adults. "We have long known juveniles are different from adults." *Goodwin v. Iowa Dist. Ct. for Davis Cnty.*, 936 N.W.2d 634, 652 (Iowa 2019) (McDonald, J., concurring specially). "The legislature already accounted for this by creating a separate juvenile justice system to address the different and particular needs of juvenile offenders." *Id.* at 653. This includes waiver and reverse waiver provisions that afford the district court discretion in determining whether a juvenile should be prosecuted as a juvenile or as an adult based on the particular circumstances of the juvenile. *See* Iowa Code §§ 232.8, .45. The legislature also, in accord with our caselaw, distinguishes between juvenile and adult offenders with respect to sentencing for murder in the first

degree. Adults convicted of murder in the first degree, such as Dorsey, are required to serve mandatory terms of life imprisonment without the possibility of parole. *See id.* § 707.2(2); *id.* § 902.1(1). Whereas, those under the age of eighteen at the time of the offense, may be eligible for parole. *Id.* § 902.1(2). And, as we explained in *Lyle*, juveniles are treated differently than adults in a variety of other contexts outside the area of criminal law. *See Lyle*, 854 N.W.2d at 388–89 (cataloging laws treating juveniles differently than adults).

The bright-line constitutional distinction between juvenile offenders and adult offenders for purposes of article I, section 17 has been clear from the outset. In reliance on that bright-line rule, the court of appeals repeatedly has considered and rejected the same argument Dorsey and the dissent advance here. *See, e.g., McGuire v. State*, No. 21–0031, 2022 WL 470841, at *4 (Iowa Ct. App. Feb. 16, 2022); *Hayes v. Polk Cnty. Dist. Ct.*, No. 19–1660, 2021 WL 3378674, at *1 (Iowa Ct. App. Aug. 4, 2021); *Mozie v. State*, No. 20–0024, 2021 WL 810962, at *1 (Iowa Ct. App. Mar. 3, 2021); *Shuford v. Iowa Dist. Ct. for Scott Cnty.*, No. 18–1434, 2020 WL 1879663, at *3 (Iowa Ct. App. Apr. 15, 2020); *Swan v. State*, No. 17–0877, 2018 WL 6706212, at *3 (Iowa Ct. App. Dec. 19, 2018); *Nassif v. State*, No. 17–0762, 2018 WL 3301828, at *1 (Iowa Ct. App. July 5, 2018); *Thomas v. State*, No. 16–0008, 2017 WL 2665104, at *2 (Iowa Ct. App. June 21, 2017); *State v. Clayton*, No. 13–1771, 2014 WL 5862075, at *5 (Iowa Ct. App. Nov. 13, 2014). "Considerations of efficiency and certainty require a bright line separating adults from juveniles." *United States v. Marshall*, 736 F.3d 492, 500 (6th Cir. 2013). We adhere to the bright-line distinction drawn in

our caselaw and repeatedly followed by the court of appeals. Dorsey is not entitled to any relief on this claim.

IV.

Dorsey also asserts a separate challenge to his sentence for the first time on appeal. Dorsey argues that his sentence of life imprisonment without the possibility of parole is "grossly disproportionate" to the crime of murder in the first degree and therefore constitutes cruel and unusual punishment in violation of article I, section 17 of the Iowa Constitution. "Where, as here, the claim is that the sentence itself is inherently illegal, whether based on constitution or statute, we believe the claim may be brought at any time." *State v. Bruegger*, 773 N.W.2d 862, 872 (Iowa 2009). This includes a claim being brought for the first time on appeal. *See id.* We thus turn to the merits of the claim.

We employ a three-part test to determine whether a sentence is grossly disproportionate to the underlying offense. The first step is a "threshold" inquiry which involves "a balancing of the gravity of the crime against the severity of the sentence." *Id.* at 873. If the sentence being reviewed does not "raise an inference of gross disproportionality," then the inquiry ends and "[n]o further analysis is required." *State v. Wickes*, 910 N.W.2d 554, 572 (Iowa 2018). If the threshold inquiry is satisfied, step two requires "an intrajurisdictional analysis to compare the challenged sentence to sentences of other crimes within our jurisdiction." *Id.* Step three requires "an interjurisdictional review and examine the sentences for similar crimes in other jurisdictions." *Id.*

At the threshold stage of analysis, our primary task is to balance "the gravity of the crime against the severity of the sentence." *Bruegger*, 773 N.W.2d at 873. In balancing these competing considerations, we consider several general principles. First, "we owe substantial deference to the penalties the legislature has established for various crimes." *State v. Oliver*, 812 N.W.2d 636, 650 (Iowa 2012). "Criminal punishment can have different goals, and choosing among them is within a legislature's discretion." *Graham*, 560 U.S. at 71. Second, "it is rare that a sentence will be so grossly disproportionate to the crime as to satisfy the threshold inquiry and warrant further review." *Oliver*, 812 N.W.2d at 650. Third, "a recidivist offender is more culpable and thus more deserving of a longer sentence than a first-time offender." *Id.* And finally, "the unique features of a case can 'converge to generate a high risk of potential gross disproportionality.'" *Id.* at 651 (quoting *Bruegger*, 773 N.W.2d at 884).

As a general matter, the sentence of life imprisonment without the possibility of parole for the crime of murder in the first degree does not raise an inference of gross disproportionality. The prohibition against cruel and unusual punishment "does not require a precise calibration of crime and punishment." *United States v. Graciani*, 61 F.3d 70, 76 (1st Cir. 1995). Rather, the prohibition "gives rise to a 'narrow proportionality principle,' forbidding only extreme sentences that are significantly disproportionate to the underlying crime." *Id.* (citation omitted) (quoting *Harmelin v. Michigan*, 501 U.S. 957, 997 (1991) (Kennedy, J., concurring in part and concurring in the judgment)). "[T]he taking of innocent life is considered the greatest universal wrong." *State v. Izzolena*, 609

N.W.2d 541, 550 (Iowa 2000) (en banc). And the proportionate response is to impose the greatest punishment allowed under our law, life imprisonment without the possibility of parole. *See State v. Fitz*, 265 N.W.2d 896, 899 (Iowa 1978) (rejecting challenge to life sentence for murder); *State v. Fuhrmann*, 261 N.W.2d 475, 479–80 (Iowa 1978) (en banc) ("Life imprisonment for first-degree murder is not so disproportionate to the seriousness of the offense as to shock the conscience or sense of justice.").

And there is nothing unique about the facts of this case that raise an inference of gross disproportionality. Dorsey entered Weaver's home armed with a shotgun in search of her son. When Weaver refused to disclose her son's whereabouts, Dorsey shot at her. Weaver fled into the bathroom, and Dorsey followed her. He reloaded the shotgun and killed Weaver with a close-range shot that left "a massive shotgun wound in [her] face and arm." Based on these facts, the jury found Dorsey guilty of committing a willful, deliberate, and premeditated murder. Dorsey's willful, deliberate, and premeditated murder of an unarmed woman in her own home justifies the most severe sentence allowed under our law. There is no inference of gross disproportionality here. *See Fuhrmann*, 261 N.W.2d at 479–80; *see also People v. Blackwell*, 207 Cal. Rptr. 3d 444, 472 (Ct. App. 2016) ("The sentence in this case, though undoubtedly harsh, does not shock the conscience and is not disproportionate. Blackwell was convicted of first degree murder with special circumstances. First degree special circumstance murder, viewed in the abstract, is perhaps the most serious offense under California law, and the facts of this particular case do not remove it from

this category."); *People v. Castillo,* ___ P.3d ___, ___ , 2022 WL 480893, at *8 (Colo. App. Feb. 17, 2022) (holding sentence of life imprisonment without parole for a murder conviction imposed on an eighteen-year-old "does not give rise to an inference of gross disproportionality").

V.

The district court did not err in denying Dorsey's challenges to his sentence.

**PETITION FOR WRIT OF CERTIORARI GRANTED AND WRIT ANNULLED.**

All justices concur except Appel, J., who dissents.

**APPEL, Justice (dissenting).**

I respectfully dissent. In my view, the proper disposition in this case under the cruel and unusual punishment clause of the Iowa Constitution is a remand to the district court for an individualized hearing to determine whether the State can show that the defendant is not entitled mitigation based upon the characteristics of youth.

**I. Introduction.**

In this case, we must decide if the evolving science regarding the characteristics of youth above the age of eighteen must be considered in cases involving the imposition of a sentence of life without possibility of parole in order to avoid a violation of the cruel and unusual punishment clause of article I, section 17 of the Iowa Constitution. If the answer to the threshold question is no, that is the end of the matter. If the answer is yes, the next question is: how should the science be applied in our cruel and unusual punishment jurisprudence?

In order to answer these questions, I first provide a brief review of the sentence of life without possibility of parole. Second, I review the cruel and unusual punishment jurisprudence for offenders under the age of eighteen developed by the United States Supreme Court and this court. Third, I examine scientific developments related to the development of adolescents since *Roper v. Simmons*, 543 U.S. 551 (2005). Fourth, I examine relevant caselaw and commentary advancing the idea that science, which had such a profound impact

on our jurisprudence related to cruel and unusual punishment for juveniles, should also apply to adolescent youth over the age of eighteen. Finally, I consider choices available to the court in applying the science and provide an analysis of why I conclude that an individualized hearing on the application of science is the proper approach in this case.

## II. Life-Without-Possibility-of-Parole Sentences.

The United States imposes more life-without-possibility-of-parole sentences than any other country in the world by far. William W. Berry III, *Evolved Standards, Evolving Justices? The Case for a Broader Application of the Eighth Amendment*, 96 Wash. U. L. Rev. 105, 109 (2018). The United States has approximately 50,000 persons serving life-without-possibility-of-parole sentences, while the runner-up countries have only a few hundred. *Id.* The United States is the only country in the world that allows life-without-possibility-of-parole sentences on juvenile offenders. *Id.* at 143.

Life without possibility of parole has been frequently compared to the death penalty. As John Stuart Mill observed centuries ago:

> What comparison can there really be, in point of severity, between consigning a man to the short pang of a rapid death, and immuring him in a living tomb, there to linger out what may be a long life in the hardest and most monotonous toil, without any of its alleviations or rewards-debarred from all pleasant sights and sounds, and cut off from all earthly hope, except a slight mitigation of bodily restraint, or a small improvement of diet?

William W. Berry III, *Life-With-Hope Sentencing: The Argument for Replacing Life-Without-Parole Sentences with Presumptive Life Sentences*, 76 Ohio St. L.J. 1051,

1053 n.7 (2015) (quoting John Stuart Mill, *Speech in Favor of Capital Punishment Before Parliament* (Apr. 21, 1868)).

Pope Francis also agreed with this comparison; he has concluded that "[a] life sentence is just a death penalty in disguise." *Address of Pope Francis to the Delegates of the International Association of Penal Law*, Vatican (Oct. 23, 2014), https://www.vatican.va/content/francesco/en/speeches/2014/october/docu ments/papa-francesco_20141023_associazione-internazionale-diritto-penale.html [https://perma.cc/P42Z-P2NW]; *see also* Brittany L. Deitch, *Life Without Parole as Death Without Dignity*, 72 Ala. L. Rev. 327, 328 n.1 (2020).

Some state courts have recognized the despair and hopelessness of life-without-possibility-of-parole sentences. For example, the Supreme Court of Nevada declared with respect to a life in prison without possibility of parole for a juvenile defendant:

> Denial of [the opportunity to seek parole] means denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of [the offender], he will remain in prison for the rest of his days.

*Naovarath v. State*, 779 P.2d 944, 944 (Nev. 1989). The court went on to hold that a sentence of life imprisonment without possibility of parole for juvenile offenders was unconstitutional on both state and federal grounds. *Id.* at 949 n.6.

Life-without-possibility-of-parole sentences deprive the individual's personhood or humanity. As noted by one observer, the essence of personhood or humanity, as culled from leading philosophers:

> [I]t is a sense of self that conveys the capacity and moral right to make choices and hence be self-determining. Self-determination, in

turn, both finds expression in and presupposes . . . some degree of (1) autonomy, defined as the capacity to influence one's environment and hence shape one's fate, (2) security, defined as the capacity to find or create stability in one's world and hence shelter oneself from harm, and (3) relatedness to others, defined as the capacity for fees for oneself and others and hence to have caring and constructive relationships.

Robert Johnson, *Death Work: A Study of the Modern Execution Process* 204 (2d ed. 1998).

By the above measure, life without possibility of parole is inhumane and the distinction between death by incarceration and death by execution is closed if not eliminated. Commentators have described a life sentence without possibility of parole as the "new death penalty" or "the other death penalty" or as being sentenced to be "buried alive." *See* Marie Gottschalk, *Sentenced to Life: Penal Reform and the Most Severe Sanctions*, 9 Ann. Rev. L. & Soc. Sci. 353, 354 (2013); *see also Miller v. Alabama,* 567 U.S. 460, 474–75 (2012) (noting that life-without-parole sentences for juveniles is akin to the death penalty).

Some persons sentenced to life without possibility of parole agree. Scholar Margaret E. Leigey has collected statements from such prisoners. *See* Margaret E. Leigey, *The Forgotten Men: Serving a Life Without Parole Sentence* (2015). One prisoner declared that a person serving life without possibility of parole "would be a lot better off if they just went on and executed him as opposed to the life without parole because that's torture." *Id.* at 15. Another prisoner stated that "it would be better if they just take us out back and shot us," and referred to the sentence as "the hard death penalty." *Id.* Given the extraordinarily severe consequences of a life-without-possibility-of-parole sentence, courts have

remarkably upheld prisoners' decisions of preferring the death penalty to life in prison. *See Autry v. McKaskle*, 727 F.2d 358, 363 (5th Cir. 1984) (per curiam) (noting prisoners preference for death over life in prison not irrational); *Smith v. State*, 686 N.E.2d 1264, 1273 (Ind. 1997) (collecting cases and concluding that prisoners preference for death over life in prison not per se irrational); Wayne A. Logan, *Proportionality and Punishment: Imposing Life Without Parole on Juveniles*, 33 Wake Forest L. Rev. 681, 712 (1998); *see also* John H. Blume, *Killing the Willing: "Volunteers," Suicide and Competency*, 103 Mich. L. Rev. 939 (2005).

**III. Overview of Cruel and Unusual Punishment Jurisprudence Applicable to Juveniles Under Eighteen Years of Age.**

**A. United States Supreme Court Precedent.**

1. *Evolving standards of decency.* I begin by briefly traveling on a familiar path. The United States Supreme Court has repeatedly declared that the content of the Cruel and Unusual Punishment Clause is not static but instead derives meaning from "evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958) (plurality opinion)); *see also Weems v. United States*, 217 U.S. 349, 378 (1910). As explained by the Supreme Court in *Kennedy v. Louisiana*, "[T]he standard of extreme cruelty is not merely descriptive, but necessarily embodies a moral judgment. The standard itself remains the same, but its applicability must change as the basic mores of society change." 554 U.S. 407, 419 (2008) (quoting *Furman v. Georgia*, 408 U.S. 238, 382 (1972) (per curiam) (Burger, C.J., dissenting)).

There can be no question that recent cases of the Supreme Court have evolved even in a relatively short period of time, particularly when dealing with harsh sentences of juvenile offenders. For example, in *Thompson v. Oklahoma*, the Supreme Court held that the death penalty could not be constitutionally applied to persons under the age of sixteen. 487 U.S. 815, 838 (1988). In the following year, the Supreme Court rejected the extension of the prohibition to persons aged sixteen to eighteen. *See Stanford v. Kentucky*, 492 U.S. 361, 378–79 (1989), *abrogated by Roper*, 543 U.S. 551. But a little more than fifteen years later, the Supreme Court overruled *Stanford* and extended the prohibition to persons under the age of eighteen. *See Roper*, 543 U.S. at 563–64 (conducting the inquiry into "our society's evolving standards of decency," and recognizing evidence of a "national consensus against the death penalty for juveniles"). Similarly, in *Penry v. Lynaugh*, the Supreme Court declined to mandate a categorical exemption from the death penalty for the mentally disabled. 492 U.S. 302, 335 (1989), *abrogated by Atkins v. Virginia*, 536 U.S. 304 (2002). But less than fifteen years later, in *Atkins v. Virginia*, the Court reversed course and declared categorically that the death penalty could not be imposed on the mentally disabled. 536 U.S. at 321. The cruel and unusual punishment cases of the Supreme Court clearly leave room for constitutional growth and development.

Applying evolving standards in three important cases, the Supreme Court determined that, notwithstanding historic practice, the Cruel and Unusual Punishment Clause of the Eighth Amendment categorically prohibited

imposition of the death penalty to persons under eighteen, *Roper*, 543 U.S. at 574–75; categorically prohibited life without possibility of parole for juveniles who commit a nonhomicidal crime, *Graham v. Florida*, 560 U.S. 48, 79 (2010); and generally held that a person under eighteen years of age who committed homicide could not be sentenced to life without possibility of parole unless shown to be a rare juvenile who was incorrigible. *Miller*, 567 U.S. at 479. These dynamic cases set the framework for analysis of the question of whether the harshest irrevocable punishments may be imposed against young offenders.

2. Roper v. Simmons. In *Roper*, the Supreme Court considered whether the death penalty could be constitutionally imposed on a juvenile who committed the crime while under the age of eighteen. 543 U.S. at 574–75. For the prosecution, the answer to this question was obvious. At trial, the prosecution argued that the young age of the offender was an aggravating factor. *Id.* at 558. The prosecution told the jury, "Think about age. Seventeen years old. Isn't that scary? Doesn't that scare you? Mitigating? Quite the contrary I submit. Quite the contrary." *Id.*

In categorically declaring that the death penalty could not constitutionally be imposed on any juvenile under the age of eighteen, the Supreme Court in *Roper* unequivocally rejected the prosecution's age-as-an-aggravating-factor theory. *Id.* at 572–73. The *Roper* Court did so in part by relying on developing neuroscience and social psychology. *Id.* at 569–70. First, the *Roper* Court emphasized that persons eighteen and under lack maturity and have an underdeveloped sense of responsibility. *Id.* at 569. Second, the *Roper* Court

stressed that juveniles are "more vulnerable or susceptible to negative influences and outside pressures, including peer pressure." *Id.* (citing *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982)). Finally, the *Roper* Court observed that "the character of a juvenile is not as well formed as that of an adult." *Id.* at 570. According to *Roper*, "From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed." *Id.*

Given these factors, not only was age not an aggravating factor as argued by the *Roper* prosecution, but age under the United States Constitution was categorically a *mitigating* factor. *See id.* at 569–73. In so holding, the Supreme Court favored science over rhetoric. In light of the neuroscience and social psychology developments that demonstrated lessened culpability of youth and greater prospects for reform, the *Roper* Court refused to embrace scientifically unsupported but politically popular age-aggravation trope. *See id.* at 573. Under the United States Constitution as interpreted by the Supreme Court, there was no constitutional space for the age-aggravation theory in applying the death penalty. *See id.*

For juveniles who committed homicidal crimes, the Supreme Court drew a line at the age of eighteen for application of the categorical ban on execution. *Id.* at 574. The *Roper* Court recognized that the drawing of a bright line had arbitrary features. *Id.* (noting that line-drawing is subject to objections). The *Roper* Court noted, "The qualities that distinguish juveniles from adults do not disappear when an individual turns 18." *Id.* Yet, according to *Roper*, "a line must

be drawn." *Id. Roper* declared that the categorical line for purposes of categorically prohibiting the death penalty was drawn at age eighteen because of its social acceptance as the dividing line between childhood and adulthood. *Id.* Nothing in Roper, however, suggests that other lines could not be drawn in other contexts involving juveniles.

3. Graham v. Florida. Indeed, *Graham* demonstrated the notion that there were further lines to be drawn. 560 U.S. 48. In *Graham,* the question was whether a juvenile offender under the age of eighteen could be sentenced to mandatory death in prison, typically referred to as life without possibility of parole, for nonhomicidal crimes. The Supreme Court, drawing another categorical line, said no. *Id.* at 74–75.

The reasoning of the decision in *Graham* hewed closely to that of *Roper.* The *Graham* Court noted that developments "in psychology and brain science continue to show fundamental differences between juvenile and adult minds[,] [f]or example, parts of the brain involved in behavior control." *Id.* at 68. It cited amicus briefs filed by the American Medical Association and the American Psychological Association for the proposition that behavior control continues to mature through adolescence. *Id.*

The *Graham* Court recognized the goals of retribution, deterrence, incapacitation, and rehabilitation. *Id.* at 71–72. While recognizing the legitimacy of retribution in criminal sentencing, the Court observed that the personal culpability of a juvenile offender was not as strong as it was with an adult. *Id.* at 74. Further, deterrence was limited because of the limited moral responsibility

of the offender. *Id.* at 72. With respect to incapacitation, the *Graham* Court noted it was difficult even for trained "psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." *Id.* at 73 (quoting *Roper*, 543 U.S. at 573). Finally, the *Graham* Court noted the similarity between the death penalty and life without possibility of parole. *Id.* at 78. Although life in prison without the possibility of parole was different than death, the *Graham* Court recognized that both "share some characteristics" in that both "alter[] the offender's life by a forfeiture that is irrevocable," and "deprive[] the convict of the most basic liberties without giving hope of restoration." *Id.* at 69–70.

The Graham Court further noted that a sentence of life without possibility of parole "forswears altogether the rehabilitative ideal." *Id.* at 74. While the Court recognized that the state was "not required to guarantee eventual freedom to a juvenile offender," it must give the offender "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Id.* at 75. In adopting a categorical rule and rejecting a case-by-case analysis, the *Graham* Court noted that it was difficult to distinguish with accuracy "the few incorrigible juvenile offenders" from the many who are capable of change. *Id.* at 77.

4. Miller v. Alabama. Finally, the Supreme Court in *Miller v. Alabama*, considered whether juveniles under the age of eighteen who committed homicidal crimes could be sentenced to life without possibility of parole. 567 U.S. 460, 465 (2012). *Miller* recognized that the observations in *Graham* were made in the

context of nonhomicidal crimes. *Id.* at 473. Yet, it emphasized that "none of what [*Graham*] said about children—about their distinctive (and transitory) mental traits and environmental vulnerabilities—is crime-specific."[1] *Id.* Here, the Supreme Court clearly broke from its "death is different" analysis in favor of a "children are different" approach, *see id.* at 472–74, and stated that "imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children." *Id.* at 474.

Again, the *Miller* Court emphasized that juvenile life sentences were "analogous to capital punishment." *Id.* at 475 (quoting *Graham,* 560 U.S. at 89 (Roberts, C.J., concurring in the judgment)). In imposing the harshest sentences like life without possibility of parole, *Miller* stressed the importance of not excluding "the possibility of compassionate or mitigating factors" from consideration. *Id.* (quoting *Woodson v. North Carolina,* 428 U.S. 280, 304 (1976)). *Miller* pointed out that Alabama's mandatory sentencing scheme "poses too great a risk of disproportionate punishment." *Id.* at 479. Although *Miller* did not foreclose the possibility of a life-without-possibility-of-parole sentence for juveniles in homicide cases, it required the state "to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 480.

---

[1]In *Miller*, the Supreme Court repeated the observations in *Graham* that the science and social science findings related to "transient rashness, proclivity for risk, and inability to assess consequences[] both lessened a child's 'moral culpability' and enhanced the prospect that, as the years go by and neurological development occurs, his ' "deficiencies will be reformed." ' " *Miller*, 567 U.S. at 472 (quoting *Graham*, 560 U.S. at 68).

An important aspect of *Miller* is the reliance on *Woodson v. North Carolina*, 428 U.S. 280 (1976). *Woodson*, of course, stands for the proposition that before the death penalty may be imposed, the court must conduct an individualized inquiry on a case-by-case basis to determine whether the defendant is sufficiently culpable to merit the death penalty. *Id.* at 304; *see also Lockett v. Ohio*, 438 U.S. 586, 605 (1978) ("[A]n individualized decision is essential in capital cases.").

**B. Iowa Precedent Regarding Juvenile Sentencing.** Although the language in article I, section 17 of the Iowa Constitution is similar to that of the Eighth Amendment to the United States Constitution, we, of course, are not bound to follow the approach of the United States Supreme Court in its interpretation of parallel Eighth Amendment provisions, and instead are free to develop our own independent approach. *E.g. State v. Ochoa*, 792 N.W.2d 260, 264 (Iowa 2010). *See generally* Mark Denniston & Christoffer Binning, *The Role of State Constitutionalism in Determining Juvenile Life Sentences*, 17 Geo. J.L. & Pub. Pol'y 599 (2019) (identifying and discussing the post-*Miller* implementation trend of criminal sentences for juvenile offenders and concluding that, due to a lack of guidance, states resolve issues in vastly different ways). That said, we look to cases of the Supreme Court, and indeed any court, for whatever persuasive reasoning they might provide. *Ochoa*, 792 N.W.2d at 264–65.

We have embraced the Supreme Court's rationale in *Roper, Graham,* and *Miller* and further extended application of the role of neuroscience and social psychology in the considering whether certain punishments of juveniles under

the age of eighteen constitutes cruel and unusual punishment under the Iowa Constitution. *See, e.g.*, *State v. Sweet*, 879 N.W.2d 811, 839 (Iowa 2016) (holding under article I, section 17 of the Iowa Constitution, juvenile offenders may not be sentenced to life without possibility of parole); *State v. Null*, 836 N.W.2d 41, 71 (Iowa 2013) (holding that lengthy sentence imposed on juvenile offenders triggers *Miller*-type protections); *State v. Pearson*, 836 N.W.2d 88, 96 (Iowa 2013) (holding that consecutive sentences resulting in lengthy imprisonment triggers *Miller-Null*-type protections); *State v. Ragland*, 836 N.W.2d 107, 118–21 (Iowa 2013) (holding that the Governor's commuted sentence amounts to mandatory life without parole and was unconstitutional under *Miller*).

In *State v. Ragland*, we considered whether the Governor's commuting of a mandatory life without possibility of parole for a juvenile offender who committed felony murder to sixty years mandatory imprisonment was constitutional under article I, section 17 of the Iowa Constitution. *Ragland*, 836 N.W.2d at 118–19. We concluded that it was not. *Id.* at 121 (holding that for all practical purposes, the same motivation in *Miller* applies to the commuted sentence since it is the practical equivalent to life without parole).

In *State v. Null*, after recognizing the fundamental differences between juveniles and adults as illustrated by *Miller*, we held that a cumulative mandatory prison term of fifty-two and a half years for second-degree murder and first-degree robbery was contrary to the Cruel and Unusual Punishment Clause of the United States and Iowa Constitutions. *Null*, 836 N.W.2d at 70–73. After extensively canvassing the body of science related to juvenile immaturity,

we concluded that the teaching of *Miller* about children being different was fully applicable and that Null was entitled to an individualized sentencing hearing to determine the question of parole eligibility. *Id.* at 70. Although not a life-without-possibility-of-parole sentence, we stated that the opportunity for geriatric release "does not provide a 'meaningful opportunity' to demonstrate the 'maturity and rehabilitation' required to obtain release and reenter society as required by *Graham.*" *Id.* at 71 (quoting *Graham*, 560 U.S. at 75).

We considered lengthy prison terms for nonhomicidal crime in *State v. Pearson*, 836 N.W.2d 88, and *State v. Lyle*, 854 N.W.2d 378 (Iowa 2014). In *Pearson*, we considered a case where a juvenile defendant was convicted of two counts of first-degree robbery and two counts of first-degree burglary in connection with a crime spree. 836 N.W.2d at 89. The defendant was sentenced to thirty-five years in prison without the possibility of parole. *Id.* We held that the teaching of *Miller*—namely, the need for an individualized hearing before a lengthy sentence is imposed on a juvenile offender—applied in a case where a thirty-five-year mandatory sentence was imposed for the crimes of robbery and burglary. *Id.* at 91, 96.

Similarly, in *Lyle*, we considered a seven-year mandatory sentence of a juvenile arising out of a second-degree robbery conviction. 854 N.W.2d at 381. We noted, among other things, that "scientific data and the opinions of medical experts provide a compelling and increasingly ineluctable case that from a neurodevelopment standpoint, juvenile culpability does not rise to the adult-like standard." *Id.* at 398. We concluded that sentencing to a statutory mandatory

minimum without a hearing to consider the mitigating factors of youth did not adequately serve legitimate penological objectives in light of the child's categorically diminished culpability. *Id.* at 399.

Our next foray into the field was *State v. Sweet,* 879 N.W.2d 811. In *Sweet,* we considered whether juvenile offenders could be sentenced to life in prison without possibility of parole for first-degree murder. *Id.* at 812. We noted that using our independent judgment under article I, section 17 of the Iowa Constitution, we have applied the principles of the *Roper-Graham-Miller* trilogy "outside the narrow factual confines of those cases, including cases involving de facto life sentences, very long sentences, and relatively short sentences." *Id.* at 834.

Further, we repeated that it was extremely difficult for even a trained psychologist to determine the small percentage of juvenile offenders who were "irreparably corrupt." *Id.* at 834. We noted that the district court could not decide in any principled way which adolescents were those very few who might later prove to be irreparably depraved. *Id.* at 837. We cited *Montgomery v. Louisiana,* 577 U.S. 190 (2016), for the proposition that a life-without-possibility-of-parole sentence should be available to a juvenile offender only in the rarest of cases. *Id.* at 834. We declined to ask our district courts to do what trained professionals with years of clinical experience declined to do, namely, identify the rarest of cases where a youth could be shown to be irreparably corrupt, thereby supporting a life-without-possibility-of-parole sentence. *Id.* at 839. Ultimately,

we held that life-without-possibility-of-parole sentences were categorically barred for juveniles. *Id.*

**IV. Post-*Roper/Graham/Miller* Authorities Applying Developments in Neuroscience and Psychology to Sentencing of Defendants Beyond Age Eighteen.**

**A. Cases Declining to Extend Analysis.** There are a number of federal and state court cases that have declined to extend the *Miller* principles where a criminal defendant was over the age of eighteen at the time of the crime. *See, e.g.*, *Wright v. United States*, 902 F.3d 868, 871–72 (8th Cir. 2018); *United States v. Williston*, 862 F.3d 1023, 1039–40 (10th Cir. 2017); *United States v. Marshall*, 736 F.3d 492, 500 (6th Cir. 2013); *Burgie v. State*, 575 S.W.3d 127, 128–29 (Ark. 2019); *State v. Allen*, 958 A.2d 1214, 1233–36 (Conn. 2008).

At least some of the cases that have denied relief, however, leave the door open to as-applied challenges to harsh sentences by young adults on cruel and unusual punishment grounds. For instance, in *People v. Harris*, the Illinois Supreme Court declined to extend the categorical prohibition of *Roper* to a seventy-six-year sentence to a young adult who was eighteen years old at the time of the crime. 120 N.E.3d 900, 912 (Ill. 2018). While the court rejected the categorical change, the court declined to rule on the question of whether the sentence might be cruel and unusual as applied. *Id.* at 912–14.

**B. Cases Considering *Roper/Graham/Miller* Principles Beyond the Age of Eighteen.**

1. Commonwealth v. Bredhold. In *Commonwealth v. Bredhold,* a Kentucky circuit court considered the potential application of the death penalty to a

defendant who was eighteen years and five months old at the time of the murder and robbery. No. 14–CR–161, 2017 WL 8792559, at *1 (Ky. Cir. Ct. Aug. 1, 2017). Notably, the judge presiding in *Bredhold* had heard testimony from a nationally known expert, Dr. Laurence Steinberg, regarding the differences between adolescents under the age of eighteen and young adults aged eighteen to twenty-one in a companion case.[2] *Id.* According to the *Bredhold* court, Steinberg testified that "if a different version of *Roper* were heard today, knowing what we know now, one could've made the very same arguments about eighteen (18), nineteen (19), and twenty (20) year olds that were made about sixteen (16) and seventeen (17) year olds in *Roper.*" *Id.*

The *Bredhold* court concluded that there was a growing consensus against the death penalty for persons under age twenty-one. *Id.* at *3. Further, the *Bredhold* court concluded that individuals in their late teens and early twenties were less mature than older adults and more likely to engage in behavior that underestimates risks and promotes "sensation-seeking." *Id.* at *4. The *Bredhold* court further noted that young adults are less able to control their impulses and consider the future consequences of their acts. *Id.* In addition, the *Bredhold* court noted that cognitive abilities mature more rapidly than emotional abilities, including the ability to exercise control, to properly consider the risks and rewards of alternative courses of action, and to resist coercive pressure from others. *Id.* According to the *Bredhold* court, the applicable research as well as

---

[2]There are some characteristics with death sentences that are shared by other sentences. *Commonwealth v. Diaz*, No. 15–CR–584–001 (Ky. Cir. Ct. Sept. 6, 2017).

the individual assessment "support the exclusion of the death penalty for this Defendant." *Id.* at *7.

The circuit court ruling in *Bredhold*, however, was short lived. The Kentucky Supreme Court vacated the ruling, noting that the defendant had not yet been sentenced and, as a result, did not have standing to support a constitutional challenge. *See Commonwealth v. Bredhold*, 599 S.W.3d 409, 417–18 (Ky. 2020).

Even so, as the *Bredhold* circuit court noted, the conclusions of an expert who made an individualized assessment of the defendant, "are still relevant." *Bredhold*, 2017 WL 8792559, at *7. The expert reported that the defendant operated "at a level at least four years below that of his peers." *Id.* According to the circuit court, the findings of the expert "further support the exclusion of the death penalty" for the defendant. *Id. Bredhold*, of course, is a death penalty case, but it extends and applies the science described in *Roper* to a case involving a criminal defendant above the age of eighteen.

2. State v. Norris. A New Jersey appellate court considered the application of *Miller* in a case involving a twenty-one-year-old defendant in *State v. Norris*, No. A–3008–15T4, 2017 WL 2062145, at *5 (N.J. Super. Ct. App. Div. May 15, 2017) (per curiam). The New Jersey appellate court in a short per curiam opinion did not explicitly state that the defendant was entitled to the same consideration as a juvenile offender, but suggested that *Miller* factors should be considered when the trial court considers a sentence for a lengthy term of incarceration. *Id.* ("[T]he real life consequences of a consecutive, extended-term sentence should

be considered, particularly under circumstances such as these, where on the attempted murder charge the most serious aggravating factors had been eliminated and the two that remained were somewhat ubiquitous.").

3. People v. House. An intermediate Illinois appellate court considered the applicability of developments in brain science to a nineteen-year-old defendant in *People v. House*, 72 N.E.3d 357, 384 (Ill. App. Ct. 2015), *appeal denied, judgment vacated*, 111 N.E.3d 940 (Ill. 2018). That case involved a question of the validity of a life-without-possibility-of-parole sentence imposed on a nineteen-year-old defendant convicted of multiple murders. *Id.* at 383. The court reasoned that while the defendant was not a juvenile at the time of the crime, his "young age of 19 is relevant in consideration." *Id.* at 384. Under the specific facts of the case, the court questioned the propriety of mandatory natural life for a nineteen-year-old under the theory of accountability. *Id.* at 385. Additionally, the court recognized the continuing brain development in adolescents, *id.*, and noted that legal scholars had observed that "the United States Supreme Court is moving rather quickly towards abolishing life without parole sentences for juvenile offenders entirely." *Id.* at 386 (quoting Maureen Dowling, Note, *Juvenile Sentencing in Illinois: Addressing the Supreme Court Trend Away from Harsh Punishments for Juvenile Offenders*, 35 N. Ill. U. L. Rev. 611, 619 (2015)). Most importantly, the court argued that while *Roper* delineated the division between juvenile and adult offenders at the age of eighteen, it did not believe that "this demarcation has created a bright line rule." *Id.* at 386. Instead, it believed such division is "somewhat arbitrary." *Id.* at 387. Accordingly, the court argued that

there was a need to expand juvenile sentencing provisions for young adult offenders. *Id.*

The *House* holding, however, was vacated by the Illinois Supreme Court, 111 N.E.3d 940, with instructions to the appellate court to consider the recent holding of the Illinois Supreme Court in *Harris*, 120 N.E.3d 900. In *Harris*, the Illinois Supreme Court held that an aggregate sentence of seventy-six years in prison upon an eighteen-year-old defendant did not violate the cruel and unusual punishment provision of Illinois's constitution where the defendant only raised a facial challenge to the sentence. *Id.* at 845. The Illinois Supreme Court refused to extend *Miller*, which it regarded as establishing a categorical rule, to persons over the age of eighteen. *Id.* at 846–47. The *Harris* court emphasized, however, that the defendant did not claim the sentence as applied to him was cruel and unusual. *Id.* at 847.

4. United States v. Cruz. A federal district court approached the question of the application of science to the sentencing of a defendant when he was eighteen years and twenty weeks old. *Cruz v. United States*, No. 11–CV–787 (JCH), 2018 WL 1541898, at *1 (D. Conn. Mar. 29, 2018), *vacated and remanded*, 826 F. App'x 49 (2d Cir. 2020). In that case, Cruz had been incarcerated for many years and was bringing his claim that the life-without-possibility-of-parole sentence amounted to cruel and unusual punishment. *Id.* at *1–2.

The *Cruz* court considered whether Supreme Court precedent barred the district court from consideration of application of the *Miller* principles to the

defendant. *Id.* at *6. According to the *Cruz* court, *Miller* said nothing about how the Eighth Amendment would apply to mandatory life without possibility for parole for those over the age of eighteen. *Id.* at *15 (stating that the state failed to recognize that there were "different kinds of lines" and taking for example that the Supreme Court expanded the protection of death penalty sentences for underage offenders from sixteen to eighteen through a series of cases from *Thompson,* 487 U.S. 815, to *Stanford,* 492 U.S. 361, and reasoning that, similarly, *Roper, Graham,* and *Miller* protected offenders that fall under the line while remaining silent as to offenders that fall above the line). As a result, *Miller* did not preclude the district court from considering the relevance of science to a cruel-and-unusual-punishment claim where the defendant was eighteen years old. *Id.* at *16.

Dr. Steinberg, an expert on juvenile brain development, testified extensively at trial. Dr. Steinberg testified that early adolescence as occurring between the ages of ten and thirteen, middle adolescence between the ages of fourteen and seventeen, and late adolescence between the ages of eighteen and twenty-one. *Cruz,* 2018 WL 1541898, at *23. Specifically, late adolescents "still show problems with impulse control and self-regulation and heightened sensation-seeking, which would make them in those respects more similar to somewhat younger people than to older people." *Id.* Therefore, scientific evidence revealed that late adolescents displayed similar characteristics of immaturity and impulsivity as juveniles under eighteen. *Id.* Yet, people in late adolescence were still more capable of change than adults. *Id.* at *24.

Additionally, Dr. Steinberg testified that at the time when *Roper* was decided, little research focused on the brain development of late adolescence or young adulthood, so when *Roper* drew the line at the age of eighteen in 2005, scientific record was not available to the United States Supreme Court as it is today. *Cruz*, 2018 WL 1541898, at *25. Based on the evidence and the body of research, the district court concluded that *Miller*-type principles should be extended to persons over the age of eighteen. *Id.* at *25.

But the United States Court of Appeals for the Second Circuit reversed. *See Cruz v. United States*, 826 F. App'x 49, 52 (2d Cir. 2020). The Second Circuit held that persons who committed offenses when over the age of eighteen were not entitled to *Miller*-type protections, and insisted that *Miller* embraced the age of eighteen as a substantive cut-off date for making similar claims. *Id.*

5. United States v. C.R. In *C.R.*, United States District Court Judge Jack Weinstein wrote a lengthy opinion considering the validity of a mandatory five-year prison sentence on a nineteen-year-old convicted of possession of child pornography. 792 F. Supp. 2d 343, 347 (E.D.N.Y. 2011), *vacated by United States v. Reingold*, 731 F.3d 204 (2d Cir. 2013). Judge Weinstein canvassed the science related to the development of juveniles into young adults, and concluded that young brains are still developing after the age of eighteen and that their culpability was therefore reduced. *Id.* at 490. He concluded under the facts of the case that the imposition of a five-year minimum prison sentence on a nineteen-year-old defendant would amount to cruel and unusual punishment. *Id.* at 510.

**V. Overview of the Science Regarding Harsh Sentences for Young Adults.**

*Roper,* of course, was decided in 2005. 543 U.S. 551. Even in *Roper,* however, the Supreme Court recognized that the juvenile brain development that impacted the culpability of criminal defendants did not end at age eighteen but extended beyond that date. *Id.* at 574.

Since then, neuroscience involving adolescents has continued to accumulate. Post-*Roper* studies reinforce the notion that impulsivity and neural plasticity are characteristic of young adults. Madison Ard, Note, *Coming of Age: Modern Neuroscience and the Expansion of Juvenile Sentencing Protections*, 72 Ala. L. Rev. 511, 520–21 (2020). Research has confirmed that the brain continues to mature beyond the age of eighteen. *See, e.g.*, Kathryn L. Mills et al., *Structural Brain Development Between Childhood and Adulthood: Convergence Across Four Longitudinal Samples*, 141 Neuroimage 273, 276 (2016); Marc D. Rudolph et al., *At Risk of Being Risky: The Relationship Between "Brain Age" Under Emotional States and Risk Preference*, 24 Developmental Cognitive Neuroscience 93, 102–03 (2017); Christian K. Tamnes et al., *Development of the Cerebral Cortex Across Adolescence: A Multisample Study of Inter-Related Longitudinal Changes in Cortical Volume, Surface Area, and Thickness*, 71 J. Neuroscience 3402, 3410 (2017). And social psychology continues to show the immaturity of young adults beyond the age of eighteen. *See, e.g.*, Alexandra O. Cohen et al., *When Is an Adolescent an Adult? Assessing Cognitive Control in Emotional and Nonemotional Contexts*, 27 Psychological Sci. 549, 550, 559–60 (2016); Kathryn Monahan et al., *Juvenile Justice Policy and Practice: A*

*Developmental Perspective*, 44 Crime & Just. 577, 582 (2015). As summarized by one commentator, "[E]ighteen-to twenty-one-year-olds [are] more similar to ten- to seventeen-year-olds on indices of psychosocial maturity than they [are] to adults twenty-six years of age and older." Andrew Michaels, *A Decent Proposal: Exempting Eighteen- to Twenty-Year-Olds from the Death Penalty*, 40 N.Y.U. Rev. L. & Soc. Change 139, 163 (2016) [hereinafter Michaels].

In light of the evolving science, there have been suggestions in scholarly literature regarding how best to treat young offenders who fall within the aged eighteen to twenty-one or eighteen to twenty-five category. Some scholars have cogently suggested simply moving some of the categorical goal posts, just like the Supreme Court did when it increased the categorical age for prohibition of the death penalty from sixteen in *Thompson* to eighteen in *Roper*. *See* John H. Blume et al., *Death by Numbers: Why Evolving Standards Compel Extending* Roper*'s Categorical Ban Against Executing Juveniles from Eighteen to Twenty-One*, 98 Tex. L. Rev. 921, 950 (2020); Carly Loomis-Gustafson, Student Article, *Adjusting the Bright-Line Age of Accountability within the Criminal Justice System: Raising the Age of Majority to Age 21 Based on the Conclusions of Scientific Studies Regarding Neurological Development and Culpability*, 55 Duq. L. Rev. 221, 237 (2017); Michaels, 40 N.Y.U. Rev. L. & Soc. Change 139. These scholars urge that the categorical judgment that the death penalty cannot be applied to children under the age of eighteen should be raised to age twenty-one or twenty-five. In the context of Iowa law, where life without possibility of parole is the

harshest sanction available, the implication is that this sentence should be categorically barred for young adults as well as those under the age of eighteen.

Other authorities have rejected a per se bar on severe sentences such as life without possibility of parole for persons over the age of eighteen, but have instead argued that the appropriate way to integrate the science into the sentencing process is through an individualized hearing. *See* William W. Berry III, *Eighth Amendment Presumptive Penumbras (and Juvenile Offenders)*, 106 Iowa L. Rev. 1, 42 (2020). One scholar has suggested that in such an individualized hearing, the state would carry the burden of demonstrating the need for a life-without-possibility-of-parole sentence. *Id.* Under such a regime, it might be difficult to apply a life-without-possibility-of-parole sentence to a nonhomicidal crime of a young adult. *Id.*

Three leading scholars—Elizabeth S. Scott, Richard J. Bonnie, and Laurence Steinberg—wrote a 2016 article considering the question of proper treatment of young adults for purposes of applying cruel and unusual punishment law. *See* Elizabeth S. Scott et al., *Young Adulthood as a Transitional Legal Category: Science, Social Change, and Justice Policy*, 85 Fordham L. Rev. 641 (2016) [hereinafter Scott]. In this somewhat dated review of scholarship, the authors recognize that it was time to reconsider the law's approach to young adult offenders in light of recent scientific research. *Id.* at 643. The authors caution that the research does not establish that individuals aged eighteen through twenty are not indistinguishable from children under the age of eighteen. *Id.* Instead, according to the authors, the young adult years can be best

understood as a transition stage between adolescence and mature adulthood. *Id.* at 644. In short, the authors reject a binary approach to childhood and adulthood. *Id.* They do not advocate simply extending the categorical goal posts of *Roper* and its progeny to persons under the age of twenty-one or twenty-five.

The authors caution is based, at least in part, on the limitations in the psychological studies of young adults. First, they note that the studies showing emotional immaturity are somewhat task dependent. *Id.* at 648–50. Second, the studies of peer pressure for the older age group are equivocal. *Id.* Third, psychological maturity varies at given ages considerably. *Id.* Finally, age differences in psychological functioning in young adulthood seems to vary as a function of context. *Id.* With respect to brain development studies, the authors observe that the research has not yet significantly informed our understanding of the characteristics necessary for the formation of social policy. *Id.* at 652.

Yet, the authors conclude that the research, though not conclusive, shows young adults may be "driven by tendencies toward impulsivity and risk-taking that characterize much of the criminal activity of juveniles." *Id.* at 656–57. Even for violent offenses, the authors suggest that the offender's relative youth should be considered in sentencing. *Id.* at 661. They assert that the evidence may support a presumption that mandatory minimum sentencing regimes should exclude young adult offenders. *Id.* at 662; *see also* William W. Berry III, *Individualized Sentencing*, 76 Wash. & Lee L. Rev. 13 (2019) [hereinafter Berry III, *Individualized Sentencing*] (urging individualized sentencing for youth over the age of eighteen); Josh Gupta-Kagan, *The Intersection Between Young Adult*

*Sentencing and Mass Incarceration*, 2018 Wis. L. Rev. 669, 714 (2018) (recommending youth be considered a separate category for cruel and unusual punishment proportionality analysis).

**VI. Discussion.**

**A. Introduction.** This case involves whether the developments in neuroscience and social science undermines a mandatory sentence of life without possibility of parole for an eighteen-year-old charged with homicide under the cruel and unusual punishment clause of article I, section 17 of the Iowa Constitution. There are two questions presented. The first question is whether the categorical rule in *Sweet*, namely, that juvenile offenders under the age of eighteen cannot be sentenced to life without possibility of parole, should be extended to cover the defendant here who committed homicide when he was just over eighteen years of age. If the answer to this question is no, a second distinctly different question arises, namely, whether a defendant is entitled to an individualized *Miller*-type hearing on the question of whether life in prison without possibility of parole may be constitutionally applied given the maturity of the defendant.

**B. Categorical Ban on Life Without Parole to Defendants Who Commit Crimes When over the Age of Eighteen.** In *Sweet*, we categorically held that a child who commits a crime while under the age of eighteen cannot be sentenced to life without possibility of parole. 879 N.W.2d at 839. The defendant here argues that the categorical rule in *Sweet* should be extended to a defendant who is just over the age of eighteen when the crime is committed. The defendant

argues that the age of eighteen should not be regarded as a "bright line" that excludes consideration of the mitigating features of youth for young adults aged eighteen and over. The State responds that the language in *Sweet* stating that the relief applied to persons eighteen years of age was designed as a "bright line" that should not be altered in this case.

Drawing the line at age eighteen for the categorical judgment in *Sweet* was not based on the notion that the mitigating factors of youth explored in those cases have no application to sentences of adolescents beyond the age of eighteen. Instead, the line has been drawn to support the categorical judgment that life without possibility of parole could *never* be imposed on *any* juvenile. *See id.* at 835–39. The risk of disproportionate punishment of youth under the age of eighteen through application of mandatory adult punishment is so high, and the ability to identify incorrigible exceptions so difficult, that an across the board judgment prohibition is required.

The case for a categorical judgment that life without possibility of parole could *never* be imposed weakens after the age of eighteen. It is no doubt true that the science has evolved since *Roper* was decided in 2005 and that the judgments made in *Roper*, and in *Sweet* have been further reinforced by additional research. But as pointed out by Scott, Binnie, and Steinberg in 2016, the neurological and social science suggesting mitigating factors involving young adults who commit serious crimes is at least somewhat more ambiguous than the studies involving children. *See generally* Scott, 85 Fordham L. Rev. 641. In other words, based on the current science, the potential disproportionality of

application of adult mandatory sentence of life without possibility of parole to persons over eighteen when the crime is committed is sufficiently reduced that a categorical ban on the punishment is not required.

As a result, I would decline the invitation of Dorsey to simply extend the categorical rule of *Sweet* prohibiting life-without-possibility-of-parole sentences to young adults like Dorsey at this time. I would not, however, rule out the possibility that at some point scientific and other developments may require a reexamination of my conclusion.

**C. As-Applied Challenge.** In the alternative to a categorical challenge, Dorsey suggests we apply a *State v. Bruegger*-type proportionality test in this case that takes into account the mitigating factors of youth. *See* 773 N.W.2d 862 (Iowa 2009). In *Bruegger,* we held that under Iowa Rule of Criminal Procedure 2.24(5)(*a*), a defendant could raise a challenge to the legality of a sentence at any time, including claims that the sentence amounted to cruel and unusual punishment. *Id.* at 884. We reviewed a case involving a number of nonexclusive factors that contributed to excessive punishment, including the convergence of a broadly defined criminal statute, the use of a juvenile adjudication when he was twelve to enhance his sentence, and the dramatic increase in his punishment resulting from the enhancement. *Id.* at 885. We emphasized in *Bruegger,* however, that no party advocated a standard for interpreting the Iowa Constitution differently from its federal counterpart. *Id.* at 883. Nonetheless, we emphasized our familiar ability to apply the generally applicable standard in a fashion more stringent than the federal caselaw. *Id.*

This case, however, is distinguishable from *Bruegger* in two important respects. First, no party in *Bruegger* presented to us an argument regarding the potential application of the evolving neuroscience in the evaluation of the defendant's culpability. In this case, however, Dorsey invites us to consider the question of gross proportionality in the context of a life-without-possibility-of-parole sentence for a person just over the age of eighteen. Second, *Brugger* involved a term of years, while this case involves the harshest sentence available in Iowa—life without possibility of parole. In short, the sum and substance of Dorsey's argument, unlike that in *Bruegger*, is to ask that this court depart from the federal precedent and extend our holdings to young adults over eighteen years old.

I now turn to Dorsey's alternate argument that he is entitled to an individualized hearing on his as-applied challenge under article I, section 17 of the Iowa Constitution. Dorsey's position is consistent with the thread of authorities that emphasize the need for an individualized assessment before the harshest sentence may be imposed on an offender. For instance, in *Atkins*, the Supreme Court ruled in the death penalty context that an individualized assessment of a defendant's mental capacity is required before the death penalty could be imposed. 536 U.S. at 317, 321 (noting that an assessment is required to decide if the offender is actually mentally impaired, and that such assessment possibly would draw much disagreement, but where the offender meets the standard, "death is not a suitable punishment for a mentally retarded criminal"). Similarly, in *Woodson* and *Lockett v. Ohio*, the Supreme Court held

that individualized assessments were required for considering mitigation in a death penalty case. *Woodson*, 428 U.S. at 304; *Lockett*, 438 U.S. at 605.

It is true, of course, that *Atkins*, *Woodson*, and *Lockett* were death penalty cases. But life without possibility of parole is the harshest of penalties in Iowa. As established earlier, "[L]ife without parole sentences share some characteristics with death sentences that are shared by no other sentences." *Graham*, 560 U.S. at 69. They are "an irrevocable judgment about that person's value and place in society." *Id.* at 74. From a practical perspective, "[a] young person who knows that he or she has no chance to leave prison before life's end has little incentive to become a responsible individual." *Id.* at 79.

In the life-without-possibility-of-parole case of *Miller*, the Supreme Court emphasized the importance of the *Woodson-Lockett* individualized assessment and suggested that the distinction between the death penalty and noncapital cases was not absolute. *See* Berry III, *Individualized Sentencing*, 76 Wash. & Lee L. Rev. at 62; William W. Berry III, *The Mandate of* Miller, 51 Am. Crim. L. Rev. 327, 339 (2014). Although *Miller* involved a defendant under the age of eighteen, the availability of an individualized hearing on proportionality of a young offender just over the age of eighteen serves as a protective measure to ensure that only the most incorrigible of young defendants receive the harshest penalty.

In my view, the state must make a showing of incorrigibility before a life-without-possibility-of-parole sentence can be imposed on a young adult in light of the reduced culpability ordinarily associated with youth. As a result, this matter should be remanded for a *Miller*-type individualized hearing to determine

whether the State can show that the defendant is incorrigible and therefore has the culpability necessary to support a life-without-possibility-of-parole-death-in-prison sentence. While an offender under the age of eighteen may be entitled to a *categorical* exclusion from a life-without-possibility-of-parole sentence, I would hold that an individual older than eighteen might be subject to life without possibility of parole provided that the state can make the necessary showing of incorrigibility to support the sentence.

Because of the confluence of the mitigating factors of youth and the harshness of the penalty, I would apply a different version of the gross proportionality test than has traditionally been applied under the federal caselaw. Instead, in the context of a youthful offender facing life without possibility of parole, the state should be required to show that the individual offender is so incorrigible that even considering a parole-based release at a later date is out of the question. This heightened sense of proportionality is necessary because of the potent combination of potential mitigating factors and the irreversible and severe nature of the underlying punishment. This extension of individualized determinations is a small but necessary evolution of our current law.

### VII. Conclusion.

For the above reasons, I would vacate the sentence and remand the matter to the district court for further proceedings consistent with this opinion.